DeJoseph v. Zambelli

*Thomas J. Burke*, for plaintiff.

*Robert W. Tredinnick*, for defendant.

DANNEHOWER, P. J., February 11, 1957.—This is an action in equity by a purchaser of real estate seeking a recission and cancellation of a deed, and with recovery of the purchase price, $18,000, together with costs and expenses incidental thereto, from defendant vendors on the grounds of false and fraudulent representations inducing the sale.

The complaint avers that defendants falsely represented that the recently whitewashed joists in the basement were "as good as new" when they were badly infected with termites; that the roof was new and didn't leak and that the basement was watertight, all of which representations were false, known to be untrue by the vendors, and were relied upon by the purchaser to his damage and loss.

Defendants filed a responsive answer denying that any misrepresentations or representations were made, or that plaintiff was fraudulently induced to purchase the dwelling. It was averred that the real estate was purchased "as is" and for their defense the vendors rely upon the doctrine of caveat emptor.

A hearing was held and from the evidence and exhibits there are made the following

### Findings of Fact

1. On February 25, 1955, plaintiff, Paul DeJoseph, entered into a written agreement of sale with defendants, Pietro Zambelli and Concetta Zambelli, for the purchase of the latter's dwelling house at 26 Madison Avenue, Belmont Hills, Montgomery County, for a total consideration of $18,000. Upon signing the agreement the plaintiff made a down payment of $1,800.

2. On May 25, 1955, plaintiff completed settlement and paid the balance of $16,200 due on the contract. On May 26, 1955, plaintiff and his wife, Lillian De-

Joseph, entered the premises and found the kitchen floor to be literally covered with termites, looking like flying ants. They never actually lived in the house, and on June 14, 1955, served notice on defendants of their election to rescind the sale and to recover the purchase price.

3. The subject premises were purchased by defendants in April, 1950, for $7,500. The dwelling was repaired and completely remodeled and the second floor was made into an apartment. The partitions dividing the rooms on the first floor were removed and the floor plan was altered, the interior was replastered and painted and a new floor was laid on the old subfloor. The roof was replaced in 1950 and a brick veneer was placed on the exterior siding. No repairs were made to the joists in the basement. In 1953, defendants put the property up for sale.

4. Plaintiff first became interested in the premises, which had been advertised for sale, on Labor Day of 1954. Defendants offered to sell the property for $18,500. In the middle of February, 1955, plaintiff again visited the premises and offered defendants $18,000. The offer was accepted and on February 25, 1955, the agreement of sale was executed.

5. Sometime in February, 1955, prior to the execution of the agreement of sale, plaintiff and his wife inspected the premises, accompanied by defendants. They were shown the first floor and the basement. The basement had been recently painted or whitewashed. When plaintiff inquired about the joists in the basement, he was told by defendant, Pietro Zambelli, that "they are as good as new". Some of the joists were obscured by shelves which were filled with jars and articles of clothing. Plaintiff also asked about the roof and was told by Pietro Zambelli that it had been replaced four years ago and did not leak.

6. Plaintiff did not return to the premises until May 26, 1955, the day after final settlement. Two or three days thereafter an inspection of the basement disclosed that the joists had been completely ravaged by termites and provided inadequate support for the floor above. Plaintiff also discovered that water had been leaking through the roof into the bedroom on the second floor. Evidence of leakage was also revealed in the vestibule of the first floor and behind the steps in the basement.

7. The inspection made of the basement further revealed that paint or whitewash had been applied to the joists in a heavy layer and that strips of wood were used to cover some of the more severe termite damage. The termite condition, which was not visible to the naked eye, could not be treated until the joists were replaced. The joists were easily penetrated with a pointed instrument and some would disintegrate and crumble when touched with the bare hands. Though most of the termite damage occurred in the basement, other parts of the dwelling, mainly the doorway to the living room on the first floor and parts of the second floor apartment, were also affected to some degree.

8. On October 1, 1956, the premises were inspected by the township superintendent of building regulations and the first floor was declared to be unsafe and dangerous for human occupancy. The prohibition, however, did not apply to the second floor apartment.

9. Plaintiff went through the dwelling for the first time in February, 1955, but made no further inspections until after settlement. Defendants were aware that the dwelling was infected by termites as early as May, 1952, and also knew at that time of water leakage in the second floor apartment.

10. The second floor apartment had been leased by defendants to Anthony and Rosa Casaveecchia from April, 1952, to June, 1955. Within a month after entering into possession, they began noticing termites com-

ing from around the doorway of the porch, from the kitchen floor and from a crack in one of the window sills. The termites got into the tenants' food and clothing and could be seen crawling on the floor and on the porch outside. In the spring of 1953, defendant, Pietro Zambelli, instructed the tenants to gather the termites with a vacuum cleaner and also offered a liquid insecticide for their extermination. The termite condition persisted up until the time the property was sold, and during this time defendants continued in their efforts to arrest and exterminate them.

11. Since July 15, 1955, the second floor apartment has been leased by plaintiff and the rentals received have been placed in trust for defendants. Plaintiff has also paid interest on the mortgage, the fuel and electric bills, water rent and taxes for the maintenance of the subject premises.

### Discussion

This case involves an action by a vendee of real property to rescind the contract of purchase on the grounds of fraud and misrepresentation, and to require the vendor to return the purchase money and restore the vendee to status quo. The defense is a general denial and caveat emptor.

The evidence discloses that defendants' vendors had knowledge of the existence of termites in their premises as early as May, 1952, and that they peristed in attempts to check and abate them until May, 1955, when the property was sold to plaintiff. This is established clearly by the testimony of the tenants in the second floor apartment who were disinterested parties to the controversy.

It was further disclosed that the basement had been given a heavy application of paint or whitewash shortly before plaintiff first inspected the premises in February, 1955. According to the description of one

witness, the basement looked like a "white sepulcher". In addition, the joists were partially obscured by shelves laden with jars and articles of clothing, and in some areas, strips of wood had been attached with the apparent purpose of concealing the more obvious termite damage. As a result of this deception and concealment, the latent defects in the joists could not be detected and were not susceptible of discovery except by expert investigation.

The inference is inescapable that defendants knew that the dwelling was infected with termites and were aware of the serious deterioration of the joists when the property was offered for sale to plaintiff. The reply to plaintiff's inquiry that the joists were "as good as new" was therefore a false material and erroneous statement of fact. It does not occur to us that plaintiff, with the exercise of ordinary diligence, could have ascertained the falsity of defendants' representation.

As to the condition of the roof and the basement, the evidence was only slight and of little significance. Hence, whether or not the case commends itself to equitable relief must depend upon the misrepresentations concerning the joists and the latent termite condition.

Where a party is induced to enter into a transaction with another by means of the latter's fraud or material misrepresentation, such a transaction can be avoided by the innocent party. Fraud arises where the misrepresentation is knowingly false, where there is any intentional concealment calculated to deceive or where there is a nonprivileged failure to disclose. Fraud renders a transaction voidable even where the misrepresentation is not material; on the other hand, a misrepresentation made innocently is not actionable unless it is material, and in such case there must be a right to reliance. A misrepresentation is material when it is of such a character that if it had not been made, the trans-

action would not have been entered into. See Restatement of the Law of Contracts, §§470, 471, 476.

Applying the above principles to the case at bar, we are of the opinion that defendants are guilty of fraud in the purposeful concealment of the termite condition in the premises, and in misrepresenting to plaintiff that the joists in the basement were "as good as new". This being true, we must conclude that plaintiff is entitled to avoid the transaction and be returned to status quo. Even in the absence of fraud, we believe the misrepresentation to be actionable, for had plaintiff known the truth of the ravaged condition of the joists, it is unlikely that he would have entered into the contract. In other words, the misrepresentation was material, and under the circumstances of the case, plaintiff was entitled to rely upon it.

The evidence in the case amply supports a finding of fraud. The artifice employed by defendants in concealing the termite condition was undoubtedly calculated to deceive and mislead plaintiff. Because of the heavy layer of paint or whitewash, the strips of wood attached to the joists and the laden shelves, it was virtually impossible for plaintiff to detect by a reasonable inspection the presence of termites or the ravaged and spoiled condition of the wood. In view of these facts, and the age and relationship of the parties, we are constrained to find that the equities in the case lie with plaintiff and that he should be entitled to the relief prayed for.

In the case of Lake v. Thompson, 366 Pa. 352, the lower court was reversed and appellant was allowed to rescind a contract for the purchase of a dwelling where the seller falsely represented that the heater, plumbing and wiring were in good condition, that a 60-foot lot off the property could be sold, that a 60-foot frontage was required by ordinance, that a ramshackle house next door was condemned and would be demol-

ished, that an unsightly water tank in the kitchen could be removed and that the cellar was dry and in good condition.

In LaCourse v. Kiesel, 366 Pa. 385, plaintiffs were induced to buy certain real property advertised in an auctioneer's handbill as " 'splendid for apartments' ", where, in fact, restrictions prohibited the use of the property other than as a single residence. The court, in allowing a rescission, held that the representation in the handbill was material and was relied upon by the purchaser. At page 390, the court stated:

"A material misrepresentation of an existing fact confers on the party who relies on it the right to rescind whether the defendants here actually knew the truth or not, especially where, as here, they had means of knowledge from which they were bound to ascertain the truth before making the representation."

In Berger v. Pittsburgh Auto Equipment Co., 387 Pa. 61, it was decided that a representation that a warehouse floor would support weights of 300 pounds and upwards per square foot, subsequently found to be incapable of withstanding even the minimum of 125 pounds as required by the building code, was material and constituted grounds for cancellation of a contract to lease.

A consideration of the evidence in this case leads to the just conclusion that plaintiff has shown by the preponderance of credible testimony the elements necessary to sustain this action for rescission of a sale of a house and lot, namely, that a representation was made as to a statement of fact, that it was untrue and known to be untrue inducing the other party to act upon it, that the latter was in fact induced to act upon it and that he did so act to his injury. Furthermore, it is not necessary for a plaintiff to prove all the fundamental represenations he alleges, but he may prevail if he proves any which in fact served as inducing causes.

## Conclusions of Law

1. Equity has jurisdiction.

2. The statement by defendants that the joists were "as good as new" was a material misrepresentation of a material fact, relied upon by plaintiff, which induced him to purchase defendants' dwelling.

3. The cost of white paint or whitewash applied to the joists and boards used to cover some of the decayed rafters, and clothing, shelving, etc., in the basement concealed the termite infested joists and showed an intent to conceal and deceive.

4. Plaintiff is entitled to rescind the contract and deed and the return of his purchase money and expenses and costs incurred by the fraudulent representations.

5. The doctrine of caveat emptor is inapplicable because defendants committed the frauds of concealment and material misrepresentations and thereby prevented detection of termite damage.

6. Costs of this proceeding should be paid by defendants.

And now, February 11, 1957, in view of the foregoing findings of fact and conclusions of law, it is ordered, adjudged and decreed, and the prothonotary shall enter the following

## Decree Nisi

1. The written agreement of sale dated February 25, 1955, for the purchase and sale of premises no. 26 Madison Avenue, Belmont Hills, Montgomery County, between plaintiff and defendants, having been properly rescinded by plaintiff, is hereby declared rescinded..

2. Plaintiff, Paul DeJoseph, is hereby directed to reconvey the premises described in the complaint, known as no. 26 Madison Avenue, Belmont Hills, Lower Merion Township, Montgomery County to de-

fendants, Pietro Zambelli and Concetta Zambelli, his wife.

3. Defendants, are hereby ordered and directed to pay plaintiff the sum of $18,000, which was the purchase price paid by plaintiff, together with all proper settlement charges, taxes paid, interest on mortgage and satisfaction thereof, and all proper and legal expenses incident to said sale, from May 26, 1955, to the date of settlement, with a proper allowance for the rent collected by said plaintiff from their tenants on the second floor.

4. Defendants are ordered to pay the costs of this proceeding.

The prothonotary is directed to give counsel notice as required by the rules of civil procedure for an action in equity, and unless exceptions are filed within 20 days after notice of the filing of this adjudication, the decree entered nisi will become the final decree as of course.

### Opinion sur Exceptions

DANNEHOWER, P. J., April 8, 1957.—Defendants have filed and argued before the court en banc, six exceptions to the chancellor's findings of fact, five exceptions to his conclusions of law, and one exception to the decree nisi, a total of 12 exceptions in this action in equity, wherein the chancellor ordered plaintiff to reconvey certain real estate to the seller, and the seller to repay the purchase price, costs and expenses on the grounds of false and fraudulent representations inducing the sale and concealing termite infected joists from the purchaser.

All of defendants' exceptions raise three main questions, which are: (1) Are the findings of fact that defendants materially misrepresented the condition of the joists supported by any substantial credible evidence; (2) or that the defective condition of the joists

was unobservable supported by any substantial credible evidence; and (3) since the defective condition was clearly visible and obvious to the touch, is not a buyer precluded from rescinding his purchase on that account?

There can be little or no doubt that when defendants remodeled this home in 1950, they did not replace the old first floor joists, but painted or whitewashed them. They well knew that these joists were infected with termites, because their tenants testified, when they complained, that defendants showed them how to sweep the termites up with a vacuum cleaner and provided them with a spray gun and insecticide. Defendants told their tenants that if they did not sell the house, they would replace the joists.

There was ample credible testimony to justify a finding that defendants knew that their joists were completely ravaged by termites, that they applied heavy coats of whitewash and new boards to conceal the termite damage and hurried plaintiff through the basement during his inspection trip. Plaintiff and his wife both testified that defendants represented that the joists were as good as new. This representation was of a material fact and relied upon by plaintiff to his damage. The chancellor was fully justified in finding that defendants actually did make this representation, which they knew to be false, notwithstanding defendants flat denial.

Furthermore, the termite-ravaged condition of the joists was not observable by the ordinary reasonable purchaser. There were clothes hanging on a line, shelves filled with jars and recently whitewashed joists which prevented discovery of the defective condition. These facts show an intent to conceal and deceive. An expert from the Terminex Company testified that he had to break through the heavy whitewash to find and see the damage, that he probed with an ice pick,

that every beam was gone and this is the largest termite damage he had ever seen in three years' experience. The photographer testified that at first the basement looked nice and white and the extensive damage became apparent when he used an icepick and then the joists crumbled and fell to the floor like sawdust. We support the chancellor's finding that the termite damage was not visible to the naked eye and there was no duty upon the purchaser to avail himself of other means of discovery, when he trusted and relied upon defendants' statement that the joists were as good as new. Since this damaged condition of the joists was not clearly visible or being able to be detected by an ordinary buyer, the doctrine of "caveat emptor" does not apply under the surrounding circumstances in this case.

In conclusion, let us say that these defendants made a misrepresentation of a material fact knowing that it was untrue and calculated to induce plaintiff to purchase this property. Immediately after plaintiff took possession he saw the termites and thousands of flying ants and had the house examined by experts. There can be no doubt, according to the building inspector and a reliable builder, that the house is unsafe for occupancy and will cost between $8,000 and $9,000 to replace the 32 termite ravaged joists. Justice and equity require a recission of this sale and the chancellor's findings are affirmed.

### Order

And now, April 8, 1957, for the foregoing reasons, all of defendants exceptions are dismissed and the decree nisi shall become the final judgment of the court.